United States District Court
For the Northern District of California

1
2
3
4
5                    IN THE UNITED STATES DISTRICT COURT

6                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8   NATURAL RESOURCES DEFENSE                    No. C -12-05380 EDL
    COUNCI, et al.,
9                                                **ORDER REGARDING EXTRA-RECORD**
                 Plaintiffs,                     **EVIDENCE**
10
          v.
11
    REBECCA BLANK, et al.,
12
                 Defendants.
13   _____/

14
          On May 3, 2013, the Court issued a Scheduling Order containing a briefing schedule and

15   hearing date relating to the parties' dispute regarding extra-record evidence.  Plaintiffs ask the Court

16   to consider extra-record evidence consisting of four declarations and two exhibits attached to a fifth

17   declaration.  Defendants oppose the consideration of any extra-record evidence.  Because this matter

18   was appropriate for decision without oral argument, the Court vacated the June 5, 2013 hearing.  For

19   the reasons stated in this Order, Plaintiffs' request to consider extra-record evidence is granted in

20   part and denied in part.

21   **Legal Standard**

22          "Judicial review of an agency decision typically focuses on the administrative record in

23   existence at the time of the decision and does not encompass any part of the record that is made

24   initially in the reviewing court."  Southwest Center for Biological Diversity v. U.S. Forest Service,

25   100 F.3d 1443, 1450 (9th Cir. 1996).  The Court may only consider extra-record materials: (1) if

26   necessary to determine "whether the agency has considered all relevant factors and has explained its

27   decision," (2) "when the agency has relied on documents not in the record," or (3) "when

28   supplementing the record is necessary to explain technical terms or complex subject matter." Extra-
     record documents may also be admitted "when plaintiffs make a showing of agency bad faith."

**United States District Court**
For the Northern District of California

1    Id.  These exceptions are narrowly construed.  The Lands Council v. Powell, 395 F.3d 1019, 1030

2    (9th Cir. 2005) ("These limited exceptions operate to identify and plug holes in the administrative

3    record. Though widely accepted, these exceptions are narrowly construed and applied.").  Moreover,

4    "consideration of the evidence to determine the correctness or wisdom of the agency's decision is

5    not permitted . . . ."  Arasco, Inc. v. EPA, 616 F.2d 1153, 1160 (9th Cir. 1980) ("It will often be

6    impossible, especially when highly technical matters are involved, for the court to determine

7    whether the agency took into consideration all relevant factors unless it looks outside the record to

8    determine what matters the agency should have considered but did not. The court cannot adequately

9    discharge its duty to engage in a "substantial inquiry" if it is required to take the agency's word that

10   it considered all relevant matters.").  The relevant factors analysis allows for consideration of extra-

11   record testimony from Plaintiff, as well as from the agency.  See Earth Island Institute v. USFS, 442

12   F.3d 1147, 1161-62 (9th Cir. 2006) (admitting plaintiff's extra-record expert declarations because

13   they were "necessary to determine whether the agency has considered all relevant factors and has

14   explained its decision."); Bair v. Cal. State Dep't of Transp., 867 F. Supp. 2d 1058, 1068 (N.D. Cal.

15   2012) (admitting plaintiff's extra-record evidence to "provide facts relevant to determine whether

16   [the agency] considered all relevant factors.").

17          Agency action, including designation and certification of an administrative record, is

18   entitled to a "presumption of regularity."  See McCrary v. Gutierrez, 495 F.Supp.2d 1038, 1041

19   (N.D. Cal. 2007) (citing Bar MK Ranches v. Yuetter, 994 F.2d 735, 739–40 (10th Cir. 1993) (while

20   the agency "may not unilaterally determine what constitutes the administrative record" the courts

21   "assume[ ] the agency properly designated the [AR] absent clear evidence to the contrary")); see

22   also Ctr. for Native Ecosystems v. Salazar, 711 F.Supp.2d 1267, 1274 (D. Colo. 2010).  The party

23   seeking supplementation bears the burden of overcoming this presumption by "clear evidence."  See

24   Bar MK Ranches, 994 F.2d at 740; Glasser v. NMFS, 2008 WL 114913, *1 (W.D. Wash. Jan.10,

25   2008); In re Delta Smelt Consolidated Cases, 2010 WL 2520946, *2 (E.D. Cal. 2010).

26   **Discussion**

27   **1.      Hoyt Declaration**

28          Erich Hoyt is senior research fellow for Whale and Dolphin Conservation ("WDC"), where

United States District Court
For the Northern District of California

1    he directs the marine protected area ("MPA") and critical habitat program and is the co-director of

2    the Far East Russia Orca Project, a research and conservation program based on Kamchatka.  Hoyt

3    Decl. ¶ 2.  In his declaration, Hoyt reviewed the procedure by which the National Marine Fisheries

4    Service ("NMFS") choose MPAs for inclusion in the final rule.  Id. ¶ 7.  Under that procedure, if an

5    MPA did not meet both criteria, it would be deemed not eligible, and would be screened out, and not

6    listed on the NMFS List of Preliminary Off-Shore Biologically Important Areas ("OBIA")

7    Nominees.  Id.  The first criterion was that the MPA under consideration not be wholly within 12 nm

8    of any coast, so that any MPA that MNFS considered to be entirely within 12 nm of the coast was

9    deemed not eligible.  Id.  Hoyt states that NMFS deemed 349 MPAs not eligible because they did

10   not meet the 12 nm criterion.  Id. ¶ 8.  Thus, based on Hoyt's review, during NMFS' initial review in

11   2009, 315 of approximately 433 MPAs considered were eliminated solely on the basis of NMFS'

12   conclusion that they were located wholly inside the area 12 nm from the coast.  Id.  Hoyt stated that:

13   "NMFS excluded 347 MPAs from consideration as wholly within the 12 nm boundary line;

14   however, NMFS incorrectly excluded 21 MPAs that, in fact and upon closer examination, extend

15   beyond the 12 nm boundary.  In addition, another 15 of the MPAs that were excluded as being

16   wholly within the 12 nm zone come directly into contact with the 12 nm boundary line."  Id. ¶ 12.

17   Among other things, Hoyt opined that: "the 12 nautical mile coastal exclusion proposed by the Navy

18   would not provide adequate protection for MPAs occurring closer to shore, such as the near-coastal

19   portions of U.S. National Marine Sanctuaries, and requires the establishment of a substantial buffer

20   zone, beyond the 1.1 nautical miles that NMFS has proscribed."  Id. ¶ 16.

21          Plaintiffs argue that the Administrative Record ("AR") is inadequate to allow the Court to

22   review Defendants' decision to exclude MPAs that extend beyond the 12 nm coastal exclusion zone

23   from consideration as Offshore Biologically Important Areas ("OBIAs").  In particular, Plaintiffs

24   contend that the AR does not contain enough information for the Court to discern that several MPAs

25   are not entirely within the 12 nm zone and therefore does not reflect that 21 MPAs were eliminated

26   from OBIA consideration on the false presumption that they were located within the coastal zone,

27   although they actually extend beyond that zone, and that 15 MPAs abut the 12 nm boundary.  Hoyt

28   Decl. ¶¶ 12-14.  Thus, Plaintiffs argue that the Court should consider the Hoyt declaration because it

1   shows that NMFS failed to explain its decision to exclude numerous MPAs that it incorrectly

2   assumed were within the 12 nm coastal exclusion zone, and to provide a buffer zone for those MPAs

3   that extend right up to the limit of that zone.  See Earth Island, 442 F.3d at 1161-62 (admitting extra-

4   record evidence indicating that the agency relied on inaccurate tree-mortality guidelines).

5   Defendants argue that the information in the Hoyt declaration is similar to Plaintiffs' comments to

6   the final rule and related to issues that are already addressed in the record.  See Opp. at 4, n.2.

7           The Hoyt declaration is necessary to determine whether the agency considered all relevant

8   factors, and also to explain complex subject matter, that is, the measurement of the coastal zone and

9   the MPAs.  Further, the declaration assesses potential harm.  Hoyt Decl. ¶¶ 12-21.  Thus, the Court

10  will consider the Hoyt declaration as extra-record evidence for these purposes.

11  **2.      Baird declaration**

12          Baird is a research biologist with Cascadia Research Collective, a non-profit research

13  organization that specializes in the study of Pacific populations of cetaceans.  Baird Decl. ¶ 2.

14  Before working at Cascadia, he was a contractor for the NMFS, for which he was Chief Scientist on

15  a study of mid-Atlantic bottlenose dolphins.  Id.  In his declaration, Baird concludes that in

16  analyzing the potential impacts of SURTASS LFA on protected species of marine mammals in

17  Hawaiian waters, the Navy did not use the best available science regarding the presence of small and

18  isolated populations of a number of species of toothed whales.  Id. ¶ 5.  Among other things, Baird

19  opined that: "For all other species in Hawaiian waters, the Final SEIS/SOEIS considers only single

20  abundance estimates, despite the recognition by NMFS in its Stock Assessment Reports of multiple

21  stocks of spinner dolphins and false killer whales in Hawaiian waters."  Id. ¶ 7.  He also stated that:

22  "Failure to recognize the existence of these small resident island-associated populations, their low

23  abundances relative to the estimates of these species throughout the Hawaiian EEZ (used in the

24  Navy's analysis), and these ranges extending further offshore than the 12 nm exclusion zone, all

25  imply that the Navy's estimates of the proportion of stocks impacted by LFA sonar use are all

26  negatively biased, i.e., that a greater proportion of these populations will be exposed to and

27  potentially impacted by LFA sonar use."  Id. ¶ 9.

28          Plaintiffs argue that Baird's declaration explains a question not adequately considered by

United States District Court
For the Northern District of California

the agency, that is, small resident island-associated populations around the Hawaiian Islands that were not accounted for in Defendants' analysis, and explains how the issue was treated in the AR. Plaintiffs argue that Baird's declaration is necessary because the AR is inadequate for the Court to assess whether Defendants accounted for LFA sonar's impacts on small genetically isolated marine mammal populations, and in particular, whether Defendants' choice to rely on pelagic estimates of marine mammals and to ignore discrete, insular populations disregarded some relevant factors.  See Earth Island, 442 F.3d at 1162 ("We allow extra-record materials if necessary to 'determine whether the agency has considered all relevant factors and has explained its decision.'") (internal citation omitted).  Further, Plaintiffs argue that the declaration is admissible for assessing the potential harms.  Baird Decl. ¶¶ 6-9.  Defendants, however, argue that Baird challenges the sufficiency of the agencies' estimates of marine mammal stock and improperly criticizes the agencies' findings regarding the effectiveness of monitoring and mitigation measures, and that both subjects are adequately addressed in the AR.

In his declaration, Baird relied on two documents that post-date the issuance of the final rule on August 13, 2012.  A party may not use "post-decision information as a new rationalization either for sustaining or attacking the Agency's decision."  Ctr. For Biological Diversity v. US Fish and Wildlife Serv., 450 F.3d 930, 943 (9th Cir. 2006).  The Court will consider the Baird declaration insofar as it addresses the question of whether the agency considered all relevant factors and the question of harm, but not for the purpose of considering references to documents that post-date the agency's final rule.

**3.     Weilgart declaration**

Weilgart is research associate at Dalhousie University, and from 2003 to 2005, she was an Assistant Professor in the Department of Biology.  Weilgart Decl. ¶ 2.  Almost all of her research has involved bioacoustics and focused on the role that sound plays in the biology of whales, especially sperm whales.  Id. ¶ 3.

Weilgart states that a 2012 study quantified the scope of the problem that for many of the world's oceans, there is little or no survey data.  Weilgart Decl. ¶ 6.  She states that the Navy's list of OBIAs reveals a bias to areas that are well studied and in North America.  Id.  She states that

United States District Court
For the Northern District of California

1    there legitimate ways to handle the data poor areas of the world's oceans in terms of OBIAs.  Id.

2    She points to an in-house white paper from 2010 providing guidance on the identification of OBIAs

3    in data-poor regions.  Id. ¶ 8.  For purposes of the OBIA analysis, Weilgart states that NMFS should

4    have used predictive modeling to estimate cetacean density and abundance.  Id. ¶ 9.  She concludes

5    that even though the final rule suggests that sperm whales are vulnerable to impacts from low

6    frequency sound, the failure to identify OBIAs exposes sperm whales to greater harm from LFA

7    sonar.  Id. ¶ 11.

8            Plaintiffs argue that Weilgart's declaration is admissible because it addresses a significant

9    issue that Defendants failed to address, that is, the existence of validated cetacean population density

10   models.  Plaintiffs also argue that Weilgart described the complicated issue of beaked whales' and

11   harbor porpoises' reactivity to acoustic disturbances in contrast to their hearing sensitivity, and that

12   although the AR identifies this issue in general, the Weilgart declaration explains why heightened

13   reactivity is an important factor that was not adequately considered by Defendants.  Defendants

14   argue that the subjects in the Weilgart declaration were adequately addressed in the AR, including in

15   comments prior to the issuance of the final rule that were submitted by Weilgart and Plaintiffs.

16           The admissibility of the Weilgart declaration is a close question.  First, Weilgart relied on a

17   document that was published in September 2012, after publication of the agency's final rule.  Even

18   though Plaintiffs argue that the document contains data that was in existence before the final rule, a

19   party may not use "post-decision information as a new rationalization either for sustaining or

20   attacking the Agency's decision."  Ctr. For Biological Diversity, 450 F.3d at 943.  Further, some of

21   the material cited by Weilgart was published very shortly before the final rule issued, and so is not

22   appropriate for consideration by the Court.  See Interstate Commerce Comm'n v. City of Jersey

23   City, 322 U.S. 503, 514 (1944) ("Administrative consideration of evidence . . . always creates a gap

24   between the time the record is closed and the time the administrative decision is promulgated.  This

25   is especially true if the issues are difficult, the evidence intricate, and the consideration of the case

26   deliberate and careful."); Sierra Club v. Kimbell, 595 F. Supp. 2d 1021, 1038 (D. Minn. 2009) ("it is

27   not reasonable to expect the [agency] to revise its work yet again on the basis of data that became

28   available only a few months before the FEIS was issued.").

1    However, the Weilgart declaration addresses the question of whether the agency

2    considered all relevant factors and the question of harm, and it explains complex subject matters.

3    Therefore, the Court will consider the declaration as extra-record evidence only for these purposes,

4    and not for the purpose of considering references to documents that post-date the agency's final rule

5    or that pre-date the final rule by only a short period.

6    **4.       Calambokidis declaration**

7          Calambokidis is a Research Biologist with Cascadia Research, a non-profit research

8    organization that he founded in 1979.  Calambokidis Decl. ¶ 2.  He has been studying marine

9    mammals since 1976 and specifically blue and humpback whales since 1986.  Id.  Calambokidis was

10   a lead researcher on parts of the Phase 1 of the SRP (Scientific Research Program), the Navy-

11   sponsored efforts to examine the impact of SURTASS LFA on baleen whales in the southern

12   California Bight directing the aerial survey and photo-ID components on the research effort for

13   Cascadia Research.  Id. ¶ 3.  He states that the study had limitations that gave it relatively low ability

14   to detect other than the most dramatic and obvious changes in behavior and distribution.  Id. ¶ 4.

15   Calambokidis states, however, that there is a current SOCAL Behaviorial Response Study that

16   utilizes far more capable tags that include detailed kinematic sensors to look at feeding, and acoustic

17   recording to document received sound level.  Id. ¶ 6.  He argues that the relative lack of data on blue

18   whales in Phase 1 is significant because blue whales are one of the more common species in the

19   North Pacific, and their abundance has not been recovering from whaling in the last twenty years, so

20   blue whales raise a major concern as to LFA impacts.  Id. ¶ 7.  According to Calambokidis, the

21   newer study demonstrates a significant response and interruption in feeding for blue whales for mid-

22   frequency sonar, and the whales would be expected to be even more sensitive to LFA.  Id. ¶ 8.

23         Plaintiffs argue that the Calambokidis declaration is admissible because it explains the

24   shortcomings of the outdated study on which the agency relied.  See High Sierra Hikers Ass'n v.

25   Department of Interior, 2011 WL 2531138, at *8 (N.D. Cal. June 24, 2011) (admitting document

26   showing "that many issues have arisen over the 20-plus years since the drafting of" document

27   agency relied on).  However, Defendants argue that the issues in the Calambokidis declaration were

28   adequately addressed in the AR.

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1    The Calambokidis declaration addresses the question of whether the agency considered all

2    relevant factors and the question of harm.   Therefore, the Court will consider the declaration as

3    extra-record evidence on those issues.

4    **5.      CetMap documents attached to Jasny declaration**

5    Jasny is a senior policy analyst with NRDC and Director of its Marine Mammal Protection

6    Project.  Jasny Decl. ¶ 1.  Jasny attached two documents to his declaration: (1) a letter by Dr. Jane

7    Lubchenco, Administrator of the National Oceanic and Atmospheric Administration ("NOAA") to

8    Nancy Sutley, Chair of the Council on Environmental Quality, dated January 19, 2010, which

9    addresses mitigation measures for Navy sonar training exercises; and (2) a document entitled

10   "Briefing Materials for Panelists, NOAA Symposium Mapping Cetaceans and Sound: Modern Tools

11   for Ocean Management," which Jasny received as a participant in the symposium on May 2012.

12   Jasny Decl. Ex. A, B.  Plaintiffs argue that the Court should consider these documents, which were

13   not considered in the decision-making process, as evidence relevant to the availability of verified

14   cetacean density and distribution models and maps intended to assist in developing mitigation

15   measures.

16   Exhibit A is a letter that essentially reviews what NOAA has done with respect to the

17   issues involving LFA.  The letter, however, does not provide any particular information about the

18   availability of verified cetacean density and distribution information.  Therefore, the Court will not

19   consider Exhibit A as extra-record evidence.

20   According to Exhibit B, the working groups featured in the document were still finalizing

21   the "geospatial products" and had not completed visualization, which indicates that the working

22   group's efforts were ongoing when the LFA rule was being developed.  This May 2012 document is

23   dated only a few months prior to the date of the final rule in August 2012, and therefore, is not

24   appropriate for consideration in this case.  See Interstate Commerce Comm'n, 322 U.S. at 514;

25   Sierra Club, 5 F. Supp. 2d at 1038.

26   **Conclusion**

27   Accordingly, Plaintiffs' request to consider extra-record evidence is granted in part and

28   denied in part.  Further, in Defendants' opposition to Plaintiffs' request for consideration of extra-

8

record evidence, which was contained in Plaintiffs' motion for summary judgment as ordered by the Court, Defendants request an enlargement of the page limit for its opposition/cross-motion for summary judgment.  Good cause appearing, Defendants' request is granted.  Defendants' opposition/cross-motion for summary judgment may not exceed 35 pages.

**IT IS SO ORDERED.**


Dated: June 5, 2013

ELIZABETH D. LAPORTE
United States Chief Magistrate Judge